UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **ALDAR INVESTMENTS, INC.** | **04-11686** |
| DEBTOR | CHAPTER 7 |
| | |
| **MARTIN A. SCHOTT, TRUSTEE** | ADVERSARY NO. |
| PLAINTIFF | **05-1005** |
| V. | |
| **J. MARVIN MONTGOMERY, FOLEY AND LARDNER, L.L.P AND BREAZEALE, SACHSE AND WILSON, L.L.P AND DARLENE RANSOME** | |
| DEFENDANTS | |

## MEMORANDUM OPINION

Trustee Martin A. Schott has moved for summary judgment challenging the validity and extent of several attorney's fee liens on settlement proceeds belonging to the bankruptcy estate of debtor Aldar Investments, Inc. ("Aldar"). Defendant J. Marvin Montgomery ("Montgomery") also seeks summary judgment recognizing a privilege in his favor on the same funds for fees owed him for representing Aldar in the lawsuit that ended in the settlement. The parties agree that Louisiana Revised Statute 37:218 governs the validity, priority and extent of the privileges.

## FACTS

Aldar was adjudicated an involuntary debtor on June 16, 2004. Its reorganization was converted to a chapter 7 liquidation on September 28, 2004. This adversary

proceeding centers on $573,949.12 the trustee received in settlement of the debtor's pre-petition lawsuit against Jefferson Downs Corporation. At various times during the litigation with Jefferson Downs, the debtor employed as counsel Montgomery, Foley & Lardner, L.L.P. ("Foley") and Breazeale, Sachse & Wilson, L.L.P. ("Breazeale").

The lawyers all claim privileges on the settlement proceeds. Although the trustee's motion states that he challenges all the privilege claims, his supporting memorandum and statements at oral argument indicate that the trustee does not dispute the validity of Montgomery's privilege claim. However, the trustee does contest the amount of fees secured by that privilege.

**Litigation History**

In 1996, Aldar filed an antitrust suit styled "Livingston Downs Racing Association, Inc. v. Jefferson Downs Corporation, *et al.*" in the United States District Court for the Middle District of Louisiana ("Antitrust Suit"). David Ralston, then with Hopkins & Sutter, began representing Aldar in connection with the Antitrust Suit in December 2000. A December 6, 2000 engagement letter signed by Ralston and Darlene Ransome, Aldar's President, confirmed that Hopkins & Sutter would bill for its services on an hourly basis. The engagement letter also provided that Aldar's liability for the fees and expenses was not contingent on the outcome of the Antitrust Suit.

Hopkins & Sutter later merged with Foley. Aldar and Foley entered into a second engagement letter dated October 2, 2002 (also signed by Ralston and Ransome) memorializing certain revisions to the December 2000 engagement letter.[1] In the October 2002 letter, Aldar agreed that Foley would continue to charge for its services on

---

[1] The amended agreement apparently was based on Aldar's failure to live up to the parties' original agreement.

2

an hourly basis, but also promised to pay an additional fee "[t]o compensate the firm for the risks associated with the restructuring . . . and the delay in payment."[2] The additional sum was to be computed as a percentage of the net proceeds of the Antitrust Litigation, after deduction of Foley's hourly fees and expenses. Aldar also agreed to execute a promissory note each month in favor of Foley for the fees outstanding at that time. The notes were to be secured by a mortgage on Aldar's immovable property.

After the December 2000 engagement letter but before the Foley merger, Aldar also hired Montgomery. Aldar's agreement with Montgomery is memorialized in a November 7, 2001 Contract for Employment of Attorney ("Contract"). In the Contract, Aldar assigned to Montgomery, as part of his fee, an interest in the suit and in any "monies or property" recovered from the suit "in accordance with the provisions of Louisiana R.S. 37:218."[3] Aldar agreed that Montgomery would receive twenty percent of the recovery from the Antitrust Suit, to a maximum of $1,000,000. The Contract was recorded in the office of the Clerk of Court for East Baton Rouge Parish on May 29, 2003.

Foley contends that Aldar and Montgomery entered into the Contract long after November 7, 2001. Its opposition to Montgomery's motion for summary judgment is supported by Ralston's declaration, two undated spreadsheets,[4] Montgomery's deposition

---

[2] Paragraph 3 of October 2, 2002 engagement letter between Foley and Aldar (Exhibit B to trustee's motion for summary judgment).

[3] Paragraph 6 of Contract for Employment of Attorney (Exhibit A to trustee's motion for summary judgment).

[4] The spreadsheets purportedly were attached to emails dated November 16, 2002 and November 18, 2002.

3

and his responses to Foley's requests for admissions.[5] Ralston's declaration disputes the date of the Contract. It points to the spreadsheet allegedly prepared on or about November 18, 2002 in connection with a settlement offer indicating that Montgomery's fees were only $25,000. Montgomery's deposition testimony and responses to requests for admissions indicate that he was not sure when the Contract was signed, but did think he drafted the agreement on or about November 7, 2001 because that was when he enrolled as Aldar's counsel in the Antitrust Suit.

Ransome's affidavit in support of Montgomery's summary judgment motion specifically states that Aldar entered into its contract with Montgomery on November 7, 2001. However, it also concedes that the written employment contract was *signed* "on or after November 7, 2001."[6] Ransome also states in her affidavit that "at no time did ALDAR ever tell Foley that Mr. Montgomery would accept $25,000 as his fee."[7]

Breazeale also performed legal services for Aldar in connection with the Antitrust Suit. Darlene Ransome's affidavit submitted in opposition to the trustee's motion for summary judgment[8] states that Aldar agreed to pay Breazeale $25,000 from the Antitrust Suit settlement proceeds, as reflected by a January 21, 2003 agreement[9] between Aldar and Breazeale. The copy of the January 2003 agreement submitted with Breazeale's

---

[5] Ralston's declaration is effectively a sworn affidavit, because an unsworn declaration reciting that it is subscribed by the declarer as true and correct under penalty of perjury has the same effect as a sworn statement. 28 U.S.C. §1746. Although Local Rule 7056-1(b) requires that an opposition to a motion for summary judgment be supported by a separate statement of disputed material facts, in the interest of justice Ralston's declarations in support of Foley's oppositions to the trustee's and Montgomery's motions will be treated as Foley's statements of disputed material facts.

[6] Affidavit of Darlene Ransome, p.3, ¶1 (Exhibit 4 to Montgomery Motion for Summary Judgment).

[7] Affidavit of Darlene Ransome, p. 6 (Exhibit 4 to Montgomery Motion for Summary Judgment).

[8] Exhibit C to Breazeale's Opposition to trustee's Motion for Summary Judgment.

[9] Aldar had two earlier agreements with Breazeale.

opposition bears only the signature of a representative of Breazeale,[10] though Ransome's affidavit recites that "to the best of her knowledge" she signed and dated the document.[11]

## ANALYSIS

### Montgomery's Privilege Claim

The trustee concedes that Montgomery holds a valid lien for his fees, but opposes Montgomery's motion on the ground that the Court must determine the reasonableness of those fees.

La. R.S. 37:218 states that:

A. By written contract signed by his client, an attorney at law may acquire as his fee an interest in the subject matter of a suit, proposed suit, or claim in the assertion, prosecution, or defense of property. Such interest shall be a special privilege to take rank as a first privilege thereon, superior to all other privileges and security interests under Chapter 9 of the Louisiana Commercial laws. . . . Either party to the contract may, at any time, file and record it with the clerk of court in the parish in which the suit is pending or is to be brought or with the clerk of court in the parish of the client's domicile. . . .

B. The term "fee," as used in this Section, means the agreed upon fee, whether fixed or contingent, and any an all other amounts advanced by the attorney to or on behalf of the client, as permitted by the Rules of Professional Conduct of the Louisiana State Bar Association.

Montgomery's Contract granted him an interest in the Antitrust Suit that creates a special privilege pursuant to La. R.S. 37:218.

Foley attempts to create a disputed factual issue by arguing that Montgomery and Aldar did not enter into the Contract on the date recited in the agreement, but rather later in the course of the Antitrust Suit. Foley's support for this position is the $25,000 Montgomery fee listed on the November 18, 2002 spreadsheet, and Montgomery's

---

[10] Exhibit B to Opposition to Motion for Summary Judgment.

[11] Affidavit of Darlene Ransome, paragraph 6 (Exhibit C to Breazeale's Opposition to Motion for Summary Judgment).

ambiguous deposition statements and admissions. However, even accepting Foley's contentions as true, they raise disputed facts – but not *material* disputed facts.[12] Foley cannot in good faith dispute that the Contract was recorded on May 29, 2003, and hence existed in written form more than one year before the involuntary bankruptcy petition was filed. Accordingly, under La. R.S. 37:218 Montgomery holds a privilege on the settlement proceeds. This does not resolve Montgomery's motion, however.

The trustee argues that the Court must weigh the reasonableness of the Contract's provision for a twenty percent contingency fee. Foley joins in this attack, arguing that the twenty percent fee is not reasonable in light of the actual work done by Montgomery on the litigation. Ralston's declaration cites several areas of dispute concerning Montgomery's contribution. Although Ransome's affidavit professes her belief that the fee sought by Montgomery is reasonable,[13] Montgomery himself has no record of time he spent working on the Antitrust Suit.

Under Louisiana law, professional fees must be reasonable, even if the amount of a fee is stipulated in a contingency fee contract. *Saucier v. Hayes Dairy Products, Inc.*, 373 So.2d 102, 116-118 (La. 1978); *Tschirn v. Tschirn*, 570 So.2d 204, 206 (La. App. 5th Cir. 1990). For this reason, the Court must determine whether Montgomery's twenty percent contingency contract was reasonable in light of the factors set out in Rule 1.5 of the Rules of Professional Conduct (formerly the Code of Professional Responsibility). *Hanks v. Columbia Women's and Children's Hospital, et al.*, 865 So.2d 745, 749 (La.

---

[12] The existence of a disputed fact will not itself preclude granting summary judgment: "'the requirement is that there be no *genuine* issue of *material* fact.'" *St. Amant v. Benoit*, 806 F.2d 1294, 1296-7 (5th Cir. 1987), quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-8, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986) (emphasis in original).

[13] Ransome's affidavit estimates that Montgomery spent approximately 500 hours on the litigation. Affidavit of Darlene Ransome, p.4, ¶2 (Exhibit 4 to Montgomery's Motion for Summary Judgment).

App. 5th Cir. 2003). This fact-sensitive determination is inappropriate for summary judgment. Accordingly, the amount of Montgomery's fees secured by the privilege under R.S. 37:218 must be determined at trial.

### Foley's Privilege Claim

More problematic is whether the debtor's agreement with Foley created a privilege under La. R.S. 37:218. The December 2000 engagement letter unambiguously stated that Foley would bill for its services on an hourly basis, and that Aldar's liability for fees and expenses was not contingent on the result of the litigation. It also provided that the hourly billing rates could change. Foley continued to bill hourly after the October 2002 revision to the engagement letter, but the October letter also granted Foley a percentage of the recovery to compensate for Aldar's failure to live up to its earlier agreement and to pay Foley timely. The analysis of Foley's claim under La. R.S. 37:218 is a two-step process.

    A. The Written Agreement Assigns Foley an Interest in the Antitrust Suit and a Privilege Under La. R.S. 37:218 for its Contingent Fee

First, pursuant to R.S. 37:218(A), Foley must have acquired as its fee "an interest in the subject matter of" the Antitrust Suit under its written contracts with the debtor. Paragraph 3(C) of the October 2002 agreement provides that the debtor will pay an "additional fee" of seven percent of any settlement after December 28, 2002.[14] The fee was to be paid from the net proceeds "realized after deduction of Foley & Lardner's hourly fees and expenses . . . ."[15] This language is not identical to that used in the statute,

---

[14] The percentage of Aldar's settlement recovery due as the additional fee to Foley varied depending on when the recovery was obtained.

[15] October 2, 2002 letter agreement between Aldar and Foley, ¶3.

7

but it is sufficient to give Foley an interest in the Antitrust Suit to the extent of the seven percent "additional fee" and, thus, a privilege on the settlement proceeds. That percentage also is subject to a court's determination of its reasonableness.

However, the language of the October 2002 letter does *not* unambiguously provide that Foley acquired an interest in the Antitrust Suit for purposes of R.S. 37:218 to secure its claim for hourly fees. Admittedly, the letter contains language indicating that Foley's hourly fees due and owing at the time of any settlement would be deducted from the proceeds of that settlement, and that Aldar agreed to apply any payments received from a settlement to Foley's outstanding fees. The agreement also called for language in any settlement agreement requiring that settlement proceeds be paid jointly to Aldar and Foley. However, this language effectively is an "agreement to agree," and Foley has offered no evidence that the parties signed a document effectuating this agreement. Nonetheless, even if the October 2002 letter *explicitly* assigned Foley an interest in the Antitrust Suit for it hourly fees, it did not necessarily entitle Foley to claim a privilege under La. R.S. 37:218 for those fees.

> B. The Privilege Afforded by La. R.S. 37:218 Does Not Extend to Fees Billed on an Hourly Basis

The second step of the analysis is determining whether Foley's hourly fee arrangement with the debtor constitutes a *fee* within the meaning of R.S. 37:218(B). That statute defines the term fee for purposes of the privilege as "the agreed upon fee, whether fixed or contingent . . . ." No reported Louisiana decisions consider the applicability of La. R.S. 37:218 to hourly attorney fee engagements. However, Louisiana principles of statutory interpretation are helpful to determine the application of R.S. 37:218 to the terms of Foley's representation of Aldar.

8

Under Louisiana law, the words of a law must be given their prevailing meaning. La. Civil Code art. 11. Words and phrases of the law must be construed according to their common and approved usage. La. R.S. 1:3.[16] More specifically, privileges are *stricti juris* and must be construed strictly. La. Civil Code art. 3185; *Southern Savings Association v. Langford Land Co.*, 372 So.2d 713, 714 (La. App. 4th Cir. 1979). A privilege cannot be extended "by implication or analogy" to a situation that the statute creating the privilege does not explicitly provide for. *Martinez v. Therma-King Sales & Service Division of Transport Refrigeration of La., Inc.*, 346 So.2d 798, 800 (La. App. 1st Cir. 1977).

Only fees that are *fixed* or *contingent* are within the scope of the privilege under La. R.S. 37:218. Another Louisiana statute creating a privilege on judgments to secure attorney's fees, La. R.S. 9:5001, uses similar language.[17] That statute provides a special privilege "to attorneys at law for the amount of their professional fees on all judgments obtained by them . . . " and defines *professional fees* to mean "the agreed upon fee, whether fixed or contingent . . . ." The Louisiana legislature's choice of statutory language in defining *fee* for purposes of R.S. 37:218 and *professional fees* for purposes of R.S. 9:5001 suggests that the legislature intended to grant those privileges only to lawyers being paid on a fixed or contingent fee basis, and no others. More specifically, the language of the statutes does not suggest that they apply to fees generated on an

---

[16] Attorney's fees are defined to mean "[t]he charge to a client for services performed for the client, such as an hourly fee, flat fee, or a contingent fee." *Black's Law Dictionary*, 139 (8th ed. 2004). A fixed fee is defined as "[a] flat charge for a service; a charge that does not vary with the amount of time or effort required to complete the service." *Id.* at 647. A contingent fee is "a fee charged for a lawyer's services only if the lawsuit is successful or is favorably settled out of court." *Id.* at 338.

[17] Both La. R.S. 37:218 and La. R.S. 9:5001 were amended in 2001.

9

hourly basis, which by their nature are not "fixed," and not contingent on the outcome of litigation.[18]

Had the legislature intended that R.S. 37:218 apply to engagements involving fees billed by the hour, it could have used the word *hourly* in the statute.[19] Alternatively, the drafters of R.S. 37:218 could have encompassed a wider range of fee agreements subject to the privilege by not using any limiting, specific terms such as *fixed* or *contingent,* to describe the fees the privilege protects. However, to suggest that hourly fees are included in the provisions of the statute impermissibly stretches the statute's plain language. The reasonable conclusion is that the term *fee* as defined in La. R.S. 37:218 does not include fees that are billed on an hourly basis.

Apart from the additional percentage contingency fee based upon Aldar's recovery from the Antitrust Suit, Foley agreed to represent the debtor on an hourly basis. The debtor's liability for Foley's hourly fees was not contingent on the outcome of the suit. Rather, the debtor had the absolute obligation to pay Foley's fees – which continued to increase for every hour billed - no matter the result of the litigation. Foley's billing rates were subject to change. Thus, neither the hourly rates nor the amount of time necessary to complete the professional services were fixed. These terms did not change from the December 2000 agreement to the October 2002 agreement. Therefore, any interest Foley may have acquired in the Antitrust Suit notwithstanding, the attorney's fees Foley claims,

---

[18] In addition, the operation of section (A) of R.S. 37:218 giving attorneys "an interest in the subject matter of a suit . . ." as their fee is contrary to the customary operation of an hourly billing arrangement between client and attorney.

[19] The limited available legislative history concerning La. R.S. 37:218, including committee meeting minutes, provided no enlightenment concerning the use of the term *fee* in the statute.

10

other than those based on a percentage of recovery in the litigation, are not within the privilege created by La. R.S. 37:218.

### Breazeale's Privilege Claim

The January 2003 letter agreement between Breazeale and Aldar expressly states that the agreed $25,000 fee shall be paid directly from the settlement proceeds. This language assigns an interest in the Antitrust Suit to Breazeale, and therefore, unless the absence of a fully executed copy of the January 2003 agreement is fatal to Breazeale's claim, it may hold a privilege under La. R.S. 37:218.[20]

Under La. Civil Code articles 1842 and 1844, the relative nullity of an obligation may be cured by express or tacit confirmation. *Vernon Parish Police Jury v. Buckley*, 829 So.2d 610 (La. App. 3$^d$ Cir. 2003) (relative nullity of incorrectly executed road servitude cured by grantor's tacit confirmation). An express confirmation requires identification of the substance of the obligation and evidence of the intent to cure the relative nullity. La. Civil Code art. 1842.

Darlene Ransome's affidavit acknowledged Aldar's obligation to Breazeale, as well as the January 2003 agreement between Breazeale and the debtor. Her affidavit expressly confirms the obligation and cures the relative nullity created by the lack of Aldar's signature on the copy of the letter. As a result, the January 21, 2003 letter agreement gives Breazeale a privilege under La. R.S. 37:218 for attorney's fees owed by

---

[20] The trustee argues that the debtor and Breazeale entered into the January 21, 2003 agreement after Breazeale completed its work on the Antitrust Suit. However, Breazeale may still have a privilege under R.S. 37:218 because an attorney and client may enter into a fee agreement or fee settlement even following the settlement of the underlying case, and still claim the privilege. *Reed v. Verwoedt*, 490 So.2d 421, 424-5 (La. App. 4th Cir. 1986).

11

the debtor.[21]  As with Montgomery's fees, however, whether the $25,000 agreed fee is reasonable requires the Court's scrutiny under Rule 1.5 of the Rules of Professional Conduct at a trial on the merits, rater than on summary judgment.

## CONCLUSION

Montgomery and Breazeale each hold a special privilege under La. R.S. 37:218 for their attorney's fees incurred in connection with the Antitrust Suit, although they must prove the reasonableness of the amount of fees claimed at trial.

Foley does not hold a special privilege under La. R.S. 37:218 to secure Aldar's hourly fee debt to it for representing Aldar in the Antitrust Suit.  However, it does have a privilege for the additional fee based upon seven percent of Aldar's recovery, subject to the Court's determination of reasonableness.

The Court will enter a judgment granting in part and denying in part both the trustee's and Montgomery's motions for summary judgment.

Baton Rouge, Louisiana, September 30, 2005.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

---

[21]  Breazeale's agreement with the debtor gives rise to the privilege and Foley's does not because Breazeale's arrangement, though once on an hourly basis, had been reduced to a fixed, agreed-upon amount in the January 2003 letter.  In contrast, Foley continued to bill Aldar on an hourly basis even after the October 2002 letter.

12